# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JESUS MARTINEZ, an individual, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. CIV-14-086-KEW ) |
| UNARCO INDUSTRIES, LLC, a foreign corporation, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment (Docket Entry #53). On April 21, 1998, Defendant Unarco Industries, LLC ("Unarco"), a manufacturer of shopping carts, employed Plaintiff Jesus Martinez ("Martinez") as a Plating Technician. Martinez is of Hispanic origin. Unarco provided its employees, including Martinez, with copies of its Associate Handbook which sets out the manner in which discrimination complaints may be brought to the attention of an immediate supervisor, the Human Resources Manager, or other members of management. Unarco also maintains a telephone hotline which employees can call to report any complaints in connection with their employment.

Additionally, Unarco's handbook contains a Code of Conduct which prohibits "[t]hreatening, intimidating, interfering, harassing, or coercing other employees or supervisors." The punishment for these actions is listed in the handbook as

"[r]eprimand to Discharge."

On April 8, 2008, Unarco transferred Martinez to the position of Road Crew in Unarco's Refurbishing/Recoating Department. Martinez's primary job duty in his new assignment was to travel to Unarco's customers and repair shopping carts. Darren Voyles ("Voyles") directly supervised Martinez and Tommy Mainard ("Mainard") supervised Voyles and oversaw all of the Refurbishing/Recoating Department.

The problems in Martinez's employment relationship with Unarco appears to have begun when a supervisor in a department where Martinez was not assigned - Jamie Fulk ("Fulk"), Unarco's Maintenance Supervisor - reported what he perceived to be potentially improper conduct by Martinez. In 2009, Fulk complained to Martinez and Martinez's supervisor, Jason Butler ("Butler") that Martinez was not properly handling *per diem* monies that were given to Martinez to cover the expenses of the Road Crew. Martinez testified that Fulk's actions "hurt my feelings" but he did not have a problem with Fulk reporting his concerns. Martinez was never disciplined by Unarco for any problems regarding the distribution of *per diem* funds.

On December 10, 2009, Martinez called the hotline to complain that Fulk had used the "F word" in speaking with him. Specifically, Fulk was passing Martinez in a golf cart when he noted Martinez was

not wearing his safety glasses. Martinez recalled that he complained that Fulk told him "where are your f****** glasses?" or "where are your fricking glasses?" The hotline recorded that Martinez stated Fulk told him to "Put your f****** glasses on." Butler testified that on December 14, 2009, Martinez came to him to speak about the hotline complaint. Ultimately, Butler states and wrote in a report that Martinez told him he did not know if Fulk said the "F word" then later recanted and, according to Butler, Martinez stated he actually did not hear what Fulk said to him when he told him to put his safety glasses on. Butler testified he asked Martinez if he wanted him to speak with Fulk and Martinez stated he would work things out with Fulk. He also allegedly told Butler that he had no other issues to discuss regarding Fulk.

Martinez denies any meeting with Butler at all. Instead, Martinez testified that he only spoke to Bobby Peters ("Peters"), who supervised Fulk and managed Unarco's Maintenance Department.

After Butler reported his discussion with Martinez, Misty Murray, the Human Resources Manager for Unarco, issued a verbal warning to Martinez on December 16, 2009. The warning was attributed to "misrepresenting the truth in a formal complaint." The form documenting the verbal warning bears a signature attributed to Martinez.

Various other confrontations between Martinez and Fulk are alleged. In December of 2012, Martinez witnessed Fulk transporting

3

an empty propane tank of a forklift in what he considered to be an unsafe manner. Fulk testified that he felt intimidated during Martinez's conversation. Martinez reported Fulk to Charlie Smith, a member of the company safety committee.

Martinez and Fulk testified in their depositions regarding a recording of a conversation between Martinez and Fulk which Fulk surreptitiously recorded after the propane tank incident. Martinez confirmed his voice on the recording and the accuracy of the conversation. Martinez told Fulk that "when somebody give me s**t, they better have their bases loaded, because I'm gonna make a home run, and I'm gonna score . . . ." He also stated in relation to his thinking at the time of the propane tank confrontation, "oh, mother f****r, I'm going to get you, one way or the other. And I got you . . . yeah, yeah, that's what I say . . . hey, that's what I say, that's what I say. Payback is hell."

While the conversation sounds relatively calm between the two men, Martinez revealed that he does not like people "talking loud" to him. He stated that during their confrontation, he wanted to punch Fulk when he spoke loudly to him. He stated, "Yeah, and that's what I was gonna do. You don't see when I was walking off, see me when I was walking off by the forklift? . . . You see when I was walking off? I was gonna grab a 90 handle, for real. I was like, oh s**t, there ain't nobody gonna talk to me like that. When you say, hey-hey, you calm down. Remember when I told you that?"

4

A 90 handle is described as a part off of a shopping cart.

Fulk stated that they should work together and that Martinez's concerns with the propane tank had been brought up with the safety committee and a policy for the transportation of the tanks was created.

Another confrontation occurred when Martinez believed Fulk had removed a pair of coveralls from a forklift and threw them on the ground. Fulk testified that he placed the coveralls on a shopping cart because he needed the forklift. Another employee witnessed an employee of an outside company accidentally bak a trailer into the shopping carts which caused the coveralls to fall on the ground. Martinez still believed at the time of the deposition that Fulk threw the coveralls on the ground, stating he had witnesses who he could not identify that had seen Fulk do so.

On January 24, 2013, Martinez, Fulk, Voyles, Mainard, Peters, and Murray met to discuss the problems between Martinez and Fulk, including the coveralls incident. Fulk also expressed concern that employees in the Refurbishing Department were using equipment in the Maintenance Department including a forklift, tractor, and a Volvo semi-truck. Fulk stated at the meeting that he did not object to the employees in the other department using the equipment but since he was responsible for the vehicles he needed to know who was using them and the reason the equipment was needed.

Murray, Voyles, Mainard, and Peters implemented a policy where

5

by employees in the Refurbishing Department had to obtain permission before using the vehicles in the Maintenance Department. Employees would have to first contact Voyles who would then notify Fulks.

On February 4, 2013, Martinez became upset when he believed someone in the Maintenance Department had dumped a sweeper and left trash on the ground. He called Fulk over the radio and informed him of the mess. He repeatedly told Fulk to "come outside."

Fulk also stated that he witnessed Martinez driving the Volvo semi-truck and that he had not obtained permission to do so. Fulk and another employee told Martinez to stop using the vehicle.

On February 7, 2013, Fulk found his office had been messed up. He was told by maintenance employee that Martinez had been in his office looking for the key to the Volvo truck. Martinez admitted in his deposition that he had been in Fulk's office to obtain the key but denied that he messed the office up. He also admitted that he had not obtained permission to use the vehicle from Voyles or Fulk.

Fulk then communicated with Martinez over the radio and Martinez told him repeatedly to "come out back." Fulk went to Murray's office to bring her to his office to survey the mess. As Murray and Fulk were walking from Murray's office to Fulk's office, Martinez repeatedly told Fulk to "come out back by yourself." Murray overheard Martinez's statements over the radio. She stated that Fulk asked Martinez if he had spoken to Voyles and Martinez responded "I don't need Darren; just come outside." Murray

considered Martinez's tone "angry, aggressive." She further stated in explanation that "[e]ven though he didn't say, Bring you ass outside, that's what it sounds like." She also described Martinez's tone as "antagonistic."

On February 7, 2013, Unarco suspended Martinez for three days pending an investigation into his behavior. Murray called Martinez into her office and told him he was suspended for threatening another employee, Fulk. Murray told Martinez to return on February 12 and the investigation would be ready. Murray gave Martinez a Disciplinary Action form and he signed it. Martinez was told by another employee that he was going to be terminated for making threats to Fulk over the radio.

Murray testified that she conducted an investigation into Martinez's conduct, speaking to other Unarco employees. However, she stated that the investigation was going to be "minimal" because she was the "main witness" to Martinez's conduct. Murray met with Butler and Mainard to discuss Martinez. She discussed the statements of other employees and Martinez's statements over the radio to Fulk which she overheard. The outcome of the meeting was a decision to terminate Martinez. The decision was made as a group. None of Martinez's past disciplinary record was discussed at this meeting.

On February 12, 2013, Martinez returned to Murray's office and was informed that he was terminated. Murray presented him with a

7

Disciplinary Action form explaining that he had been terminated for threatening another employee. Martinez took the form home, signed it, and mailed it back to Unarco. He expressed no complaints against Murray, Butler, or Mainard. Fulk was the only person Martinez believed "didn't like me."

Martinez stated in his deposition that about ninety percent of Unarco employees are Hispanic. He would like to return to work and feels they would treat him with respect.

On February 14, 2013, Martinez sent a letter to Unarco stating he believed that he had been discharged due to a misunderstanding and that he did not intend to harass or threaten. He also did not believe one violation was ground for termination.

Unarco did not rescind Martinez's termination. It also did not replace Martinez.

On March 7, 2014, Martinez commenced this action, alleging violations of Title VII for race discrimination and retaliation; 42 U.S.C. § 1981 for race discrimination and retaliation; negligent supervision; and failure to provide notice of a COBRA election. On May 29, 2014, Martinez dismissed the Title VII retaliation claim. On June 29, 2015, he dismissed the § 1981 retaliation claim, as well as the claims for negligent supervision and for a COBRA violation. Thus, the sole remaining claims are for race discrimination in violation of Title VII and § 1981.

Summary judgment is appropriate only if there is no genuine

dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Henderson v. Inter-Chem Coal Co., Inc., 41 F.3d 567, 569-70 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986); Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial. *See* 1-800-Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1242 (10th Cir. 2013)(citation omitted). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. Anderson, 477 U.S. at 248. The facts must be considered in the light most favorable to the nonmoving party. Cillo v. City of Greenwood Vill., 739 F.3d 451, 461 (10th Cir. 2013)(citations omitted).

The Court will not consider statements of fact, or rebuttals

thereto, which are not material or are not supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3). Only admissible evidence may be considered when ruling on a motion for summary judgment. <u>Jaramillo v. Colorado Judicial Dep't</u>, 427 F.3d 1303, 1314 (10th Cir. 2005)(citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion); <u>World of Sleep, Inc. v. La-Z-Boy Chair Co.</u>, 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible evidence at trial. <u>Murray v. City of Sapulpa</u>, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." <u>Id</u>.

Whether asserted through the vehicle of 42 U.S.C. § 1981 or 42 U.S.C. § 2000e-2(a) (Title VII), Martinez's race discrimination claims require an identical analysis. <u>Drake v. City of Ft. Collins</u>, 927 F.2d 1156, 1162 (10th Cir. 1991). To state a *prima facie* case of race discrimination, Martinez must show (1) that he is a member of a racial minority; (2) that he suffered an adverse employment action; and (3) that similarly situated employees were treated differently. <u>Trujillo v. University of Colo. Health Sciences Ctr.</u>, 157 F.3d 1211, 1212 (10th Cir. 1998). To establish a case of intentional discrimination, Martinez has two options – he may satisfy his burden of proof by offering direct evidence of

10

discriminatory intent or he may demonstrate such intent indirectly by following the McDonnell Douglas burden-shifting framework. Thomas v. Denny's, Inc., 111 F.3d 1506, 1509 (10th Cir. 1997).

To prevail by coming forth with direct evidence, "a plaintiff must introduce direct or circumstantial evidence that the alleged [discriminatory] motive 'actually relate[s] to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace.'" Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir. 1999)(citations omitted). ; see also Thomas, 111 F.3d at 1512 (holding that plaintiff may prove discriminatory motive by "presenting 'evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'")(citations omitted).

Martinez has not come forward with any direct evidence of racial animus. Some stray comments were referenced in the record concerning African-Americans and "Mexicans". However, Martinez admits that Unarco is a generally favorable working atmosphere for Hispanics. Moreover, no direct racial animus had been demonstrated in the decision making process resulting in the adverse employment action taken again Martinez. As a result, the McDonnell Douglas framework must be employed.

Certainly, Martinez has satisfied the first element of

11

demonstrating membership in a protected minority class. He has also shown that he suffered an adverse employment action in his termination.

As to the third element, Martinez has not proved that the decision to terminate him was motivated by race or through unlawful discrimination based upon his race. Martinez has not alleged any racial statements or discriminatory conduct by any of the parties who decided to terminate him - Murray, Butler, or Mainard. While not a decision maker, Martinez has also failed to demonstrate the Fulk was motivated by racial animus. Martinez testified that he had never heard Fulk make a racial comment. He attempted to explain his deposition testimony with a subsequent affidavit by stating he believed Unarco's attorney asked if he had heard Fulk make a derogatory comment about African-Americans which he did not. He states in his affidavit that when Spanish was spoken over the radio, Fulk would state "this is an American channel. We don't speak that language here." He also thought Fulk yelled at Hispanic employees.

To the extent the subsequent affidavit is appropriate - which it generally is disallowed when used to create a "sham factual dispute" - the comments attributed to Fulk are only tangentially racially based and not evidence of direct racial animus. Moreover, Martinez stated that ninety percent of the employees of Unarco were Hispanic. It stands to reason that the employees involved in any harsh tones from supervisors would be of Hispanic origin.

Rather, Martinez brings his claims based primarily upon the allegation that other similarly situated employees who do not belong to a protected class engaged in conduct similar to that alleged against Martinez but did not suffer termination. Martinez originally offered the affidavits of Unarco employees Dennis Korte ("Korte"), James Potts ("Potts"), Chris Daniels ("Daniels"), and Stacy Yates ("Yates"). At its request, Unarco was permitted to take the depositions of these witnesses to ascertain the basis of their affidavit statements. The parties were then permitted to supplement the briefing on the Motion with their discovery and additional arguments.

This case does not present the typical situation where an affidavit is offered subsequent to a deposition. The affidavits were offered as exhibits to the original briefs and then the depositions were taken. While the affidavits will be given some consideration, the depositions offer the most detailed explanation of events from the perspective of the four other employees.

Korte testified that he worked in the Maintenance Department with Fulk as his supervisor and Peters overseeing the entire Maintenance Department. He did not consider that Fulk discriminated against Martinez. Rather, Korte's problem with Fulk was that he "micro-managed" employees. He also believed Fulk's military experience lead him to his management style. Korte testified that Fulk at one point informed them that he did not have their backs

regarding a safety issue that arose at work. Korte told him if they were in battle and Fulk was the leader and made that statement, then he "would be a dead son of a bitch and I would be the first motherf****r to shoot you." Korte stated he told Fulk this because of their mutual military background. He did not mean he was threatening Fulk. No other member of management within the department heard the statement.

Potts testified he was supervised by Fulk in the Maintenance Department. They butted heads a lot but they worked well together. He complained to Peters about Fulk making him clean up scrap cuttings when he did not make the mess. Peters sent Potts to Murray who suspended him for three days for insubordination. Potts testified that on one occasion, he told Fulk that "when I get another job, we're going to go out back and have a talk." He stated that he did not intend this statement as a threat to Fulk because he knew he would be terminated for doing so. This statement was not reported to Murray or Human Resources and no one from that department directly heard the statement being made.

Yates testified that he argued loudly with Fulk. One incident he remembered had to do with Yates returning to work from a break. Yates never threatened Fulk, made any physical contact with him, or used profane language. They took their dispute to Murray and Yates considered it resolved as best they could.

Daniels testified about an incident between 2003 and 2006 that occurred while both he and Fulk were supervisors. They had a heated argument when Fulk called Daniels a "stupid motherf****r", Daniels said "f*** you" and struck Fulk flat handed in the face. As far as Daniels knows, the incident was not reported to anyone and Fulk later apologized. This incident occurred before Murray worked at Unarco. Other incidents of cussing at one another occurred.

"One method by which a plaintiff can demonstrate an inference of discrimination is to show that the employer treated similarly situated employees [who are not in the protected class] more favorably." Luster v. Vilsack, 667 F.3d 1089, 1095 (10th Cir. 2011)(bracketed information added by this Court). Generally, to be similarly situated, employees must deal with the same supervisor. McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006). The basis for this requirement lies in the reasoning that "[d]ifferent supervisors will inevitably react differently" to employee misconduct. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1233 (10th Cir. 2000).

Clearly, Korte, Daniels, Yates, and Potts were not similarly situated with Martinez. They each worked in the Maintenance Department under Fulk and Peters. Testimony indicated that under Unarco's management system, all employees are assigned to individual departments and each department has its own supervisor and manager who are responsible for assigning work. Supervisors and managers in

15

one department cannot issue discipline or make employment decisions for employees in another department. In the Maintenance Department, Fulk and Peters assigned the employees in the department their work tasks, made sure they complied with company policies, conducted their annual performance evaluations, made wage decisions for their employees, and had input in any disciplinary action taken against them, together with Murray. Fulk and Peters did not have any influence over the disciplinary decisions made with regard to employees in other departments.

Martinez was employed in the Refurbishing Department where Voyles and Butler were his supervisors at various times and Mainard was his manager. Neither Fulk nor Peters were involved in Martinez's discipline.

The fact that most separates the occurrences involving these four employees from Martinez's discipline and termination was the fact that Murray was a witness to the threatening behavior and acted on her own observations. She was not privy to any of the disputes between the four employees in the Maintenance Department and Fulk.

Martinez contends Murray's involvement in discipline for all departments obviates the requirement recognized under the law for the same supervisors for similarly situated employees. However, it is clear that the individual supervisors and managers for each department were integral in the disciplinary decisions with Murray and, therefore, were still crucial in the decision making process.

The concern that different supervisors may react differently to similar circumstances remains. The unusual aspect of Martinez's termination was Murray's actual first hand observation of the transgression.

To the extent Martinez alleges that Fulks reported the threatening incident involving him but not the other four identified employees, the evidence does not indicate that Fulks reported any threatening conduct by Martinez. The discipline acted upon by Murray, Butler, and Mainard stemmed from Murray's witnessing of Martinez's statements over the radio, not on any complaint by Fulks that he had been threatened by Martinez.

This Court must conclude that Martinez has failed to provide supporting evidence to maintain a *prima facie* case of race discrimination under either Title VII or § 1981. To that end, Unarco is entitled to summary judgment on all remaining claims asserted in this action.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Docket Entry #53) is hereby **GRANTED**. Judgment will be entered for Defendant accordingly.

IT IS SO ORDERED this 25th day of March, 2016.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE